# EXHIBIT 2

| CIVIL ACTION COVER SHEET | DOCKET NUMBER | Trial Court of Massachusetts<br>The Superior Court |
|---|---|---|

PLAINTIFF(S): Steven Serabian

ADDRESS: 5 Gerald Circle, Acton, MA

COUNTY: Middlesex

DEFENDANT(S): SAP America, Inc.

ATTORNEY: Philip J. Gordon

ADDRESS: Gordon Law Group, LLP, 585 Boylston St., Boston, MA 02116

ADDRESS: 3999 West Chester Pike, Newtown Square, PA 19073 and 15 Wayside Road, Burlington, MA

BBO: 630989

**TYPE OF ACTION AND TRACK DESIGNATION (see reverse side)**

| CODE NO. | TYPE OF ACTION (specify) | TRACK | HAS A JURY CLAIM BEEN MADE? |
|---|---|---|---|
| A99 | Violation of the Massachusetts Wage Act | F | ☒ YES ☐ NO |

*If "Other" please describe:

**STATEMENT OF DAMAGES PURSUANT TO G.L. c. 212, § 3A**

The following is a full, itemized and detailed statement of the facts on which the undersigned plaintiff or plaintiff counsel relies to determine money damages. For this form, disregard double or treble damage claims; indicate single damages only.

**TORT CLAIMS**
(attach additional sheets as necessary)

A. Documented medical expenses to date:
1. Total hospital expenses .......... $
2. Total doctor expenses .......... $
3. Total chiropractic expenses .......... $
4. Total physical therapy expenses .......... $
5. Total other expenses (describe below) .......... $

**Subtotal (A):** $

B. Documented lost wages and compensation to date .......... $
C. Documented property damages to dated .......... $
D. Reasonably anticipated future medical and hospital expenses .......... $
E. Reasonably anticipated lost wages .......... $
F. Other documented items of damages (describe below) .......... $

G. Briefly describe plaintiff's injury, including the nature and extent of injury:

**TOTAL (A-F):$**

**CONTRACT CLAIMS**
(attach additional sheets as necessary)

Provide a detailed description of claims(s):
The Defendant has failed to pay the Plaintiff wages which are due and owing.

**TOTAL: $** AT LEAST 25,000

**Signature of Attorney/Pro Se Plaintiff: X** [signature] **Date: 1/22/2016**

**RELATED ACTIONS:** Please provide the case number, case name, and county of any related actions pending in the Superior Court.

**CERTIFICATION PURSUANT TO SJC RULE 1:18**

I hereby certify that I have complied with requirements of Rule 5 of the Supreme Judicial Court Uniform Rules on Dispute Resolution (SJC Rule 1:18) requiring that I provide my clients with information about court-connected dispute resolution services and discuss with them the advantages and disadvantages of the various methods of dispute resolution.

**Signature of Attorney of Record: X** [signature] **Date: 1/22/2016**

COMMONWEALTH OF MASSACHUSETTS

MIDDLESEX, ss SUPERIOR COURT

| | |
|---|---|
| STEVEN SERABIAN<br><br>Plaintiff,<br><br>v.<br><br>SAP AMERICA, INC.<br><br>Defendant. | Civil Action No. ____________ |

**COMPLAINT**

This is a complaint for unpaid wages arising out of defendant's failure to pay plaintiff commissions that were definitely determined and due and payable, and for retaliation because plaintiff was terminated when he requested his pay. Plaintiff has satisfied the statutory prerequisites to suit, and this action is timely commenced.

**INTRODUCTION**

Plaintiff Steven Serabian ("Mr. Serabian") is a former high-level employee of defendant, SAP America, Inc. ("SAP"), who was paid based on commissions. In November 2014, $235,738 in commissions had become definitely determined and due and payable to Mr. Serabian. SAP confirmed it in writing, and then informed Mr. Serabian that the commissions would be paid in two installments rather than one, with half in November 2014 and half in November 2015.

Mr. Serabian received the first half of the $235,738 commission in December 2014, but this past November/December he did not receive the second half. This action is commenced to recover that second half – or $117,869 – as well as $796,834 in additional commissions from earlier sales for which SAP failed to pay, many of which are also confirmed by email from Mr.

Serabian's compensation executives as being due and payable, along with treble damages and attorneys' fees thereon pursuant to G.L. c. 149, § 150.

Much of these commission confirmations come as a result of communications between Mr. Serabian and his compensation executives concerning SAP's commission plans and their failure to pay compensation. Yet, after finally validating that it owed Mr. Serabian his commissions in September 2014, SAP then informed Mr. Serabian in October that he would be terminated. As a result, this action also seeks to recover for the unlawful retaliation resulting from Mr. Serabian asserting his rights under the Wage Act regarding his commissions.

## PARTIES, JURISDICTION AND VENUE

1. Mr. Serabian is an individual residing in the Commonwealth of Massachusetts, in the town of Acton, Middlesex County, Massachusetts.

2. Defendant, SAP is a corporation headquartered in Newtown Square, Pennsylvania, and with an office loacted in Burlington, Massachusetts.

3. This Court has jurisdiction over this matter, and this county is a proper venue pursuant to G.L. c. 223, § 1 and G.L. 223A, § 2.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

4. Pursuant to the state law requirements as set forth in Massachusetts General Law Chapter 149 § 150, the Plaintiff has filed his statutory claims with the Office of the Attorney General.

5. Plaintiff filed a Non-Payment of Wage and Workplace Complaint Form with the Attorney General's office on January 22, 2016.

**FACTUAL ALLEGATIONS**

6. Mr. Serabian began his career in the CRM software industry in 1992 and has been in account management sales roles for the last 20 years. Besides SAP, he has sold for four pre-IPO and public CRM software companies over that timeframe with great success. During this time period, Mr. Serabian has been a valued individual contributor and recognized for both national and regional sales achievements. He has never been fired from any of the sales position he has held.

7. Mr. Serabian started his employment at SAP on February 14, 2011. During the interview process, it was communicated to Mr. Serabian that his annualized sales plan would include $110,000 in base pay with an additional "at-plan" $150,000 variable pay incentive component that, combined, comprised his annualized $260,000 compensation plan.

8. Mr. Serabian held the following positions and corresponding titles during his tenure at SAP: 2/4/11-12/31/11 (Specialist IV Product Sales; CRM Sales Specialist, Line of Business Solutions), 1/1/12-12/31/12 (CRM Solution Account Executive; CRM Account Executive, Line of Business Solutions), 1/1/13-12/31/13 (CRM Cloud Account Executive; Strategic Account Executive; SAP Cloud Customer) and 1/1/14 – 11/21/14 (Cloud LOB Account Executive; Strategic Account Executive, SAP Customer Engagement and Commerce).

9. During Mr. Serabian's first two years of employment at SAP, the salesforce was organized into two primary sales roles. The first role was referred to as a GCO Account Executive, and the second as a Co-Prime Sales Specialist. GCO Account Executives were responsible for a handful of accounts, with overall account responsibility, and were compensated on all SAP/Partner products sold into an account. The Co-Prime Sales Specialist role was responsible for a special set of products sold into an account, and were assigned sales quota for a

sales region consisting of multiple GCO Account Executives. Like other software companies, Co-Primes were responsible for and compensated on the sales quota number across an entire sales region. Co-Primes could lead, co-lead or just be aware of sales opportunities in their territory. While varying levels of effort were expended, compensation was paid out on all deals in the territory regardless.

10. During FY11 and FY12, Mr. Serabian was responsible for primarily selling SAP's OnPremise CRM Software and Partner Solution Extension products. In 2012, SAP ramped up their Cloud based CRM and ERP product sales to the market. A separate and additional Cloud Co-Prime Sales team was put in place to do so. This Cloud Co-Prime sales team had minimal experience selling CRM products. Given this and the very limited success that this team had selling Cloud based CRM products in 2012, SAP established a Cloud CRM SWAT team in 2013. This third sales role was staffed with individuals that had a rich heritage of selling both OnPremise and Cloud based CRM to strategic accounts at the executive level. Mr. Serabian was heavily recruited by SAP sales management to join this team and did so in 2013 because of his CRM sales acumen and recognized success selling Cloud and OnPremise CRM both at Oracle and SAP.

11. While employed at SAP, Mr. Serabian's performance was reviewed twice annually with the exception of his last year in FY14 where no performance reviews were done. Mr. Serabian fully met expectations for his performance ratings in FY11 and FY12 while being the only team member to receive the highest "extraordinary" performance rating in FY13. He was 243% of sales quota in FY11, 91% of sales quota in FY12 and 253% of sales quota in FY13. This performance was recognized by SAP with winners circle sales club attainment in FY11 and top performers winners circle attainment in FY13.

12. In FY11, Mr. Serabian was recognized by his manager as "a top performing CRM Co-Prime and a role model for the position".

13. In FY12, Mr. Serabian was recognized by his manager as having "a well established brand that consists of being professional, thoughtful, with honed sales skills and a high degree of integrity. He is perseverant and provides stability to the CRM East team. He is consistent in communicating his brand through his daily actions and activities".

14. In FY13, Mr. Serabian was recognized by his manager as being "a consummate sales professional in every sense of the word", "THE go to CRM sales professional" for both CRM OnPremise and Cloud for Customer solution sales", and "a 'textbook' example of integrity in the SAP Sales Organization".

15. Mr. Serabian's performance reviews referenced above reflect in writing the multi-millions of dollars he was attributed to generating for the relevant periods covered by the reviews.

16. While employed at SAP, Mr. Serabian's compensation was defined by annual sales plans that augmented his base salary with incentive based compensation.

17. For FY11, although Mr. Serabian was hired with a $150,000 variable pay incentive, SAP began paying him on a $140,000 variable incentive until his actions through HR had this corrected in July of that year. Thus, there were two compensation plans for FY11 with the associated commission rates.

18. For FY12, there was a territory alignment in FY12 after Q1 and as such there are two compensation plans for FY12 with the associated commission rates.

19. For FY13, although Mr. Serabian had made several requests to obtain his sales compensation plan earlier in the year, it was not provided to him until November 1, 2013, after

the majority of the year had passed and the majority of his sales deals had been closed. Mr. Serabian accepted this compensation plan on November 7, 2013 and his boss approved the plan on that same day with both activities being completed through SAP's Incentive Compensation solution.

20. Yet, there were issues from the beginning with SAP paying Mr. Serabian his proper commissions.

21. In FY11, Mr. Serabian attained 168% of his sales quota by the end of Q2. He continued to work diligently for the rest of FY11 and added an additional 74% of his sales quota by year end for a total annual percent of quota of 243%. Including his base salary and MBO's, Mr. Serabian earned $436,496 of total compensation of which $326,496 was variable sales compensation, of which $42,213 was tied to MBO and SPIFF achievements. Yet, in February of 2012, Mr. Serabian was contacted by his management and told that they would not be paying him 28.6% of his total FY11 variable sales compensation which equated to $93,378. Mr. Serabian was informed simply that there was apparently no longer enough money in the larger commission pool to pay all of the sales commissions due.

22. In FY12, Mr. Serabian's sales compensation plan indicated that he would be paid a $5,000 bonus for quota attainment in 2 out of the 4 quarters of the year and an additional $25,000 for quota attainment in 3 out of 4 quarters of the year. Mr. Serabian had sold over his quota for FY12 in quarters 1, 3 and 4. A large part of the 4th quarter quota attainment was tied to a transaction at a particular, major client where Mr. Serabian successfully sold/booked a partner product sale in the amount of $1,087,500. SAP only credited Mr. Serabian sales quota credit of $931,474 because a credit for a non-CRM license type conversion that the customer already owned was incorrectly applied to the dollar value of Mr. Serabian's sale reducing his quota credit

by $156,026. As a result, SAP Incentive Compensation had stated that they would not be paying Mr. Serabian's additional FY12 $25,000 linearity bonus as well as the corresponding $6,085 sales commission that was associated with the reduction in sales quota credit.

23. Mr. Serabian brought this to the attention of his sales management. A compensation exception was put forth to SAP Incentive Compensation and was not approved. Mr. Serabian had to have numerous conversations with SAP Sales Operations indicating this error. Subsequently, SAP paid Mr. Serabian his $25,000 linearity bonus which indicated that SAP incorrectly assigned quota credit on the deal, but they never paid the outstanding $6,085 sales commission.

24. In May of FY13, a major client had told SAP that they were electing to buy a competitor's CRM over SAP's OnPremise CRM solution which the SAP Sales Core team had positioned. As part of SAP's CRM SWAT Team responsible for this account, Mr. Serabian diligently worked to reverse this decision and sell the client a hybrid CRM deployment that involved both SAP's Cloud based CRM as well as SAP OnPremise CRM software. Mr. Serabian was key in developing the rationale behind why this hybrid solution was better than the competitor's offering. He was also responsible for the articulation of this rational to the client as well as working to obtain pricing approvals from high level executives at SAP given that this was the largest transaction of its type at the time.

25. As a result of Mr. Serabian's efforts, that CRM deal was signed/closed on September 27, 2013. There was a 60-day out clause granted in the deal, but the major client did not elect to exercise this out clause and the deal became bookable on November 27, 2013. In total, this 5-year SAP Cloud based CRM contract amounted to an annual contract value of $2,895,763 with a total 5 year contract value of $14,478,815. The SAP OnPremise CRM portion

of the deal was an additional $12,500,000. Although Mr. Serabian had a mutually signed FY13 sales compensation plan, at that time SAP did not indicate the amount that he would be paid and when.

26. During a meeting in August of FY13, the then SAP VP of CRM Sales (Joe Fuster) stated in a national meeting of CRM Account Executives that SAP's sales of their OnPremise CRM solutions and associated partner products had fallen off dramatically. SAP executive management had attributed this to the fact that Mr. Fuster's sales team was not focused on selling these solutions in FY13 because sales compensation plans did not include sales commissions for this type of software, but were rather Cloud based. Mr. Fuster further stated that for the 2nd half of FY13, a 2% SPIFF would be paid to all SAP CRM Cloud Account Executives who participated in and helped close deals that had SAP OnPremise CRM solutions in them. As a result of this change, SAP Sales Management provided SAP CRM OnPremise pipeline reports for the remainder of FY13 to all CRM Cloud Account Executives, including Mr. Serabian, so as to provide visibility to SAP CRM OnPremise deals for them to focus their selling efforts around. Given the 2% SPIFF, moving forward Mr. Serabian focused his sales efforts on selling both SAP's Cloud and OnPremise based CRM software.

27. In October 2013, another SAP client purchased $903,000 of SAP's OnPremise CRM Solution Sales Configurator. Mr. Serabian had worked on this opportunity in FY13 resulting in a significant strategic win for SAP. Mr. Serabian was recognized as participating in and helping to close this successful sales outcome by SAP Sales Management. Yet, SAP Incentive Compensation did not indicate the amount that Mr. Serabian would be paid according to the sales SPIFF and when.

28. SAP acquired Hybris in a business deal, and subsequent to the Hybris acquisition, in the fall of FY13 SAP Sales Compensation offered a $5K SPIFF to SAP CRM AE's who were involved in helping close any Hybris sales transactions. Mr. Serabian was involved and helped successfully close a Hybris Transaction in November of 2013. Yet, SAP Incentive Compensation did not indicate the amount that Mr. Serabian would be paid according to the sales SPIFF and when.

29. Because SAP did not have Mr. Serabian's sales compensation plan in place until November 1, 2013, SAP withheld any payment of sales commissions associated with FY13 until September 15 of that year. Although SAP Incentive Compensation made an additional sales commission payment on or around November 30, it was not in accordance with Mr. Serabian's FY13 sales compensation plan.

30. In November 2013, Mr. Serabian noticed that SAP's FY13 Q1-Q3 commission payments did not map to his sales compensation plan as well as the FY13 sales SPIFFs that a number of his deals had qualified for. Mr. Serabian began working with SAP Incentive Compensation and SAP HR in earnest in November 2013 to rectify this situation. Mr. Serabian requested additional clarification in February 2014 on how his FY13 Q4 sales commissions and SPIFFS would be handled which now included the particular major client transaction. Although SAP made two additional FY13 sales commission payments to Mr. Serabian in March of 2014, they still did not match what he was owed as per his approved FY13 sales compensation plan.

31. Mr. Serabian requested additional clarification in February 2014 on how his FY13 Q4 sales commissions would be handled. These conversations continued through April of 2014 without success. In May 2014, Mr. Serabian began working with Ms. Christine Freese, the VP of SAP Cloud Sales Compensation. It took Mr. Serabian until the end of June 2014 to get Ms.

Freese to agree to provide a breakdown of Mr. Serabian's FY13 sales compensation (although at that specific time she did not provide that breakdown).

32. On August 22, 2014, Mr. Serabian contacted Ms. Freese's supervisor, Ryan Tobin (the COO of SAP Cloud Operations) asking him if he could help address Mr. Serabian's FY13 compensation issues. Finally, after repeated further efforts, on September 19, 2014, Mr. Serabian did have a phone call with Ms. Feese, Mr. Tobin and Mr. Poon a sales compensation specialist who worked for Ms. Freese. In that call, they agreed that Ms. Freese would supply Mr. Serabian with the details of his FY13 commissions and a payment plan for all outstanding commissions. On that same day, Mr. Serabian did receive an email from Ms. Freese with an attached spreadsheet confirming all of his earned FY13 commissions in accordance to his FY13 sales plan. She had forwarded this email to Mr. Tobin for review and approval to pay Mr. Serabian. On that same day, Mr. Tobin notified Ms. Freese by email that these payments were correct and payable to Mr. Serabian. At that time, Mr. Serabian did not receive an associated payment plan from Ms. Freese.

33. For approximately the next month, Mr. Serabian continued to request the outline of the payment plan for his outstanding FY13 commissions. Although Mr. Serabian was paid $57,684 on October 15, 2014 (for the SPIFFS on certain transactions), he did not receive a payment plan for the rest of the commissions that were due. Mr. Serabian continued his request to SAP Cloud Compensation and SAP HR and received no reply from them.

34. On October 21, 2014 Mr. Serabian was told by his manager Ms. Cindy Roberto and his HR representative Mr. Tom Casey that his position was terminated. On October 27, 2014, Ms. Freese did email Mr. Serabian and state that he would be paid on the SAP CRM Cloud portion of the client deal specifying an amount and payment plan. The amount specified was

much lower than the agreed to amount previously communicated to Mr. Serabian by Ms. Freese and approved by Mr. Tobin and did not include the 2% sales compensation SPIFF for the SAP OnPremise CRM software that was sold in the same deal.

35. As part of the termination process, Mr. Serabian requested that his HR person (Tom Casey who was copied on all emails that Mr. Serabian sent requesting resolution to his unpaid commissions) summarize the amount and payment plan for his outstanding sales compensation. Mr. Casey responded only with information about Mr. Serabian's severance package and unused vacation.

36. Mr. Serabian did seek to remain employed at SAP and also resolve his unpaid compensation issue. He spent considerable time during his last month of employment looking for another position at SAP to move into. Mr. Serabian was unable to find a position, as SAP was under a hiring freeze at that time and any hire would have to be made on an exception process. Mr. Serabian's HR representative Tom Casey informed Mr. Serabian that the SAP board of Directors was presently not approving any hiring exceptions that point in time, and Mr. Serabian was processed out of SAP on November 21, 2014 without a resolution to his outstanding FY13 sales commissions.

37. On December 15, 2014, Mr. Serabian was subsequently paid $117,869 towards his outstanding FY13 sales compensation from SAP.

38. As per Ms. Freese email dated September 19, 2014 and in accordance with Mr. Serabian's FY13 sales compensation plan, SAP calculated that Mr. Serabian earned $57,684 in SPIFFS and an additional $928,082 in SAP Cloud CRM sales commissions. In addition to that, Mr. Serabian is owed $250,000 for the 2% SPIFF on the SAP OnPremise portion of the 2013 major client sales transaction. In total, in FY13 Mr. Serabian made $1,235,766 in sales

compensation above his base pay. To date, SAP has only paid Mr. Serabian $420,526 towards this total. Thus, SAP still owes Mr. Serabian $815,240 in outstanding FY13 sales commissions.

39. Every year, SAP HR requests feedback from 35% (randomly chosen) of its global employees on how to improve the services that they provide. On July 29, 2014, Mr. Serabian was notified that he was randomly chosen as a participant for the survey and asked to complete the survey. On July 28th, Mr. Serabian gave his candid feedback, rating the compensation area the lowest rating along with his justification to do so based on SAP's failure to pay his FY13 sales compensation.

40. As noted above, Mr. Serabian was notified he was being terminated on October 21, 2014. On that day, Mr. Serabian was asked to attend a conference call by his present SAP sales manager Cindy Roberto. On that call, Ms. Roberto along with Mr. Serabian's SAP HR specialist Tom Casey informed Mr. Serabian that his current sales position at SAP had been eliminated. Ms. Roberto indicated that Mr. Serabian would be processed out of SAP on November 21, 2014 if he could not find another position within the company. When asked, Mr. Casey indicated that this was not related to Mr. Serabian's performance at SAP (and given Mr. Serabian's outstanding sales achievements, it could not have been). On this phone call, Mr. Serabian asked how his unpaid FY13 sales compensation would he handled and Mr. Casey indicated that SAP had done so by recently paying him $57,684 (however, this was the SPIFFS payment). Mr. Casey further stated that SAP would itemize any FY14 sales commissions along with unused vacation time and a severance payment as part of Mr. Serabian's termination process. Mr. Roberto closed the call by letting Mr. Serabian know that he would receive an email from HR detailing the termination process and on October 22, 2014. Mr. Serabian received this email.

41. SAP provided Mr. Serabian with his severance package on November 25, 2014. Given his unresolved commissions and the terms of the release of claims in Mr. Serabian's severance package, Mr. Serabian elected not to sign the severance package.

42. As set forth in the Introduction above, which is incorporated by reference herein, Mr. Serabian was not paid $117,869 this past November/December despite prior confirmation from SAP in writing that this money would be paid to him as of November 26, 2015.

43. Through his diligent efforts and reputation in CRM Sales, Mr. Serabian obtained new employment subsequent to his wrongful termination from SAP on March 23, 2015, although he continues to suffer damages until his compensation reaches the levels he achieved at SAP.

## CAUSES OF ACTION

### COUNT I: FAILURE TO PAY WAGES PURSUANT TO G.L. c. 149, § 148

44. Mr. Serabian earned commissions that, pursuant to his sales commission plans were definitely determined and due and payable and, thus, constituted wages und General Laws Chapter 149, Section 148.

45. Mr. Serabian was not paid these wages.

46. Pursuant to General Laws Chapter 149, Section 150, SAP should be ordered to pay Mr. Serabian these wages, in an amount to be determined at trial, trebled, and with statutory interest, trebled, as well as Mr. Serabian's reasonable attorneys' fees and costs of suit.

### COUNT II: BREACH OF CONTRACT

47. SAP's failure to pay Mr. Serabian his commissions owed constitutes a breach of contract.

48. Mr. Serabian should be awarded those unpaid commissions, in an amount to be determined at trial, with statutory interest, and costs of suit.

## COUNT III: BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

49. SAP selected Mr. Serabian for lay-off in order to attempt to avoid paying him commissions due to him as established by his approved sales compensation plans and further approved by email by SAP Executive Management; in particular, the commission due to him on the major client deal. This termination was a termination in breach of the implied covenant of good faith and fair dealing which forbids termination of an at-will employee in order to deprive the employee of earned compensation.

50. Notably, the severance package offered to Mr. Serabian seeks his waiver of any commissions not payable to him within 90-days of his termination. This would have included money SAP promised to pay Mr. Serabian in a second installment for the major client deal in November 2015. While Mr. Serabian refused to sign that document, the document shows SAP's motivation to deprive Mr. Serabian of this part of the major client commission SAP agreed it owed him.

51. Mr. Serabian should be awarded damages, in an amount to be determined at trial, plus interest and costs of suit for this wrongful termination.

## COUNT IV: UNJUST ENRICHMENT

52. SAP was unjustly enriched, in reaping unfair benefit through the violations described above render it liable to Mr. Serabian under the common law doctrines of unjust enrichment/quantum meruit. As a result, Mr. Serabian should be awarded damages, in an amount to be determined at trial, plus interest and costs of suit as a result of the unjust enrichment to SAP.

**COUNT IV: RETALIATORY TERMINATION IN VIOLATION OF G.L. c. 149, § 148A**

53. SAP selected Mr. Serabian for lay-off within a short period of time of his repeated complaints to be paid substantial commissions due and payable to him. Such decision was motivated in whole or in part by Mr. Serabian's complaints about not being paid his commissions due to him and his raising issues and pursuing these commissions due to him.

54. Pursuant to General Laws Chapter 149, Section 150, Mr. Serabian should be awarded damages arising out of his termination, in an amount to be determined at trial, including any lost pay, treble damages, statutory interest, reasonable attorneys' fees, and costs of suit.

**DEMAND FOR JURY TRIAL**

Mr. Serabian hereby seeks a trial by jury on his claims.

**PRAYER FOR RELIEF**

WHEREFORE, for the reasons above, this Court should enter judgment for Mr. Serabian, awarding him:

A. Unpaid commissions.

B. Statutory interest.

C. Lost pay.

D. Trebling of his unpaid commissions, interest and lost pay.

E. Reasonable attorneys' fees.

F. Costs of suit.

G. Such other and further relief as this Court deems necessary and proper.

By the attorneys for Mr. Serabian (Plaintiff),

Philip J. Gordon (BBO #630989)
Kristen M. Hurley (BBO #658237)
GORDON LAW GROUP LLP
585 Boylston Street
Boston, Massachusetts 02116
(617) 536-1800

| CIVIL TRACKING ORDER (STANDING ORDER 1- 88) | DOCKET NUMBER 1681CV00198 H | Trial Court of Massachusetts The Superior Court |
|---|---|---|
| CASE NAME: Serabian, Steven vs. SAP Amrica, Inc. | | Michael A. Sullivan, Clerk of Court Middlesex County |
| TO: Philip Gordon, Esq.<br>Gordon Law Group, LLP<br>585 Boylston Street<br>Boston, MA 02116 | | COURT NAME & ADDRESS<br>Middlesex County Superior Court - Woburn<br>200 Trade Center<br>Woburn, MA 01801 |

**TRACKING ORDER - F - Fast Track**

You are hereby notified that this case is on the track referenced above as per Superior Court Standing Order 1-88. The order requires that the various stages of litigation described below must be completed not later than the deadlines indicated.

**STAGES OF LITIGATION** — **DEADLINE**

| | SERVED BY | FILED BY | HEARD BY |
|---|---|---|---|
| Service of process made and return filed with the Court | | 04/25/2016 | |
| Response to the complaint filed (also see MRCP 12) | | 05/25/2016 | |
| All motions under MRCP 12, 19, and 20 | 05/25/2016 | 06/24/2016 | 07/25/2016 |
| All motions under MRCP 15 | 05/25/2016 | 06/24/2016 | 07/25/2016 |
| All discovery requests **and depositions** served and non-expert despositions completed | 11/21/2016 | | |
| All motions under MRCP 56 | 12/21/2016 | 01/20/2017 | |
| Final pre-trial conference held and/or firm trial date set | | | 05/22/2017 |
| Case shall be resolved and judgment shall issue by | | | 01/25/2018 |

**The final pre-trial deadline is <u>not the scheduled date of the conference</u>.** You will be notified of that date at a later time.

**Counsel for plaintiff must serve this tracking order on defendant before the deadline for filing return of service.**

This case is assigned to

| DATE ISSUED | ASSISTANT CLERK | PHONE |
|---|---|---|
| 01/26/2016 | Dia S Roberts-Tyler | (781)939-2772 |

COMMONWEALTH OF MASSACHUSETTS

MIDDLESEX, ss SUPERIOR COURT

| STEVEN SERABIAN<br><br>Plaintiff,<br><br>v.<br><br>SAP SOFTWARE SOLUTIONS, INC.<br><br>Defendant. | Civil Action No.1681-CV-00198 H |
|---|---|

**AFFIDAVIT OF SERVICE OF KRISTEN M. HURLEY**

I, Kristen M. Hurley, under oath hereby depose and state as follows:

1. I am an attorney licensed to practice law in the Commonwealth of Massachusetts. I do so with the firm of Gordon Law Group, LLP.

2. I represent the Plaintiff in the above-captioned matter.

3. On or about February 3, 2016, counsel for the Defendant, Bronwyn L. Roberts, Esq., agreed to accept service on behalf of the Defendant.

4. On or about February 12, 2016, I served a copy of the Civil Action Cover Sheet, Civil Complaint and Tracking Order on Attorney Roberts via electronic mail.

Signed under the penalties of perjury this 17th day of February, 2016.

Kristen M. Hurley

**Certificate of Service**

I, Kristen M. Hurley, attorney for the plaintiff in the above-captioned action, hereby certify that I served a true and accurate copy of the foregoing document upon counsel for the defendants, Bronwyn L. Roberts, Esq., Duane Morris, 100 High Street, Suite 2400, Boston, MA 02110, via federal express on February 17, 2016.

Kristen M. Hurley

COMMONWEALTH OF MASSACHUSETTS

MIDDLESEX, ss SUPERIOR COURT

| | |
|---|---|
| STEVEN SERABIAN,<br>Plaintiff,<br>v.<br><br>SAP AMERICA, INC.,<br>Defendant. | CIVIL ACTION: 1681-CV-00198 |

**NOTICE OF APPEARANCE**

Kindly enter my appearance on behalf of the Defendant, SAP America, Inc. in the above-captioned matter.

DATED: February 26 2016

Respectfully submitted,

**SAP AMERICA, INC.,**
By its attorneys,

Bronwyn L. Roberts (#638079)
Duane Morris LLP
100 High Street, Suite 2400
Boston, MA 02110
(857) 488-4200 (phone)
(857) 488-4201 (fax)
blroberts@duanemorris.com

**CERTIFICATE OF SERVICE**

I hereby certify that on February 26, 2016, the foregoing document was served by first class mail postage prepaid, upon the party of record as follows:

Kristin M. Hurley, Esq.
Gordon Law Group, LLP
585 Boylston Street
Boston, MA 02116

Bronwyn L. Roberts

COMMONWEALTH OF MASSACHUSETTS

MIDDLESEX, ss SUPERIOR COURT

STEVEN SERABIAN,
Plaintiff,

v.

SAP AMERICA, INC.,
Defendant.

CIVIL ACTION: 1681-CV-00198

**NOTICE OF APPEARANCE**

Kindly enter my appearance on behalf of the Defendant, SAP America, Inc. in the above-captioned matter.

DATED: February 26, 2016

Respectfully submitted,

**SAP AMERICA, INC.,**
By its attorneys,

Jennifer L. Mikels (BBO# 682199)
Duane Morris LLP
100 High Street, Suite 2400
Boston, MA 02110
(857) 488-4200 (phone)
(857) 488-4201 (fax)
JLMikels@duanemorris.com

**CERTIFICATE OF SERVICE**

I hereby certify that on February 26, 2016, the foregoing document was served by first class mail postage prepaid, upon the party of record as follows:

Kristin M. Hurley, Esq.
Gordon Law Group, LLP
585 Boylston Street
Boston, MA 02116

Jennifer L. Mikels

COMMONWEALTH OF MASSACHUSETTS

MIDDLESEX, ss SUPERIOR COURT

STEVEN SERABIAN,
Plaintiff,
v.

SAP AMERICA, INC.,
Defendant.

CIVIL ACTION: 2016-CV-00198

**STIPULATION OF EXTENSION OF TIME TO**
**FILE ANSWER OR RESPONSIVE PLEADING**

NOW COMES the Plaintiff, Steven Serabian ("Serabian"), and the Defendant, SAP America, Inc. ("SAP"), by and through their undersigned attorneys, and stipulate and agree that SAP will have up to and including Thursday, March 17, 2016 to file its Answer, counterclaims and/or responsive pleadings to the Serabian's Complaint.

STEVEN SERABIAN,
By his attorney,

Philip J. Gordon (BBO#630989) / BLR w/ permission
Kristin M. Hurley (BBO #658237)
Gordon Law Group, LLP
585 Boylston Street
Boston, MA 02116
(617) 536-1800 (phone)
Fax: 617-536-1802 (fax)
pgordon@gordonllp.com
khurley@gordonllp.com

SAP AMERICA, INC.,
By its attorneys,

Bronwyn L. Roberts (BBO #638079)
Jennifer L. Mikels (BBO #682199)
Duane Morris LLP
100 High Street, Suite 2400
Boston, MA 02110
(857) 488-4200 (phone)
(857) 488-4201 (fax)
blroberts@duanemorris.com
jlmikes@duanemorris.com

DATED: February 26, 2016

**CERTIFICATE OF SERVICE**

I hereby certify that on February 26, 2016, the foregoing document was served by first class mail postage prepaid, upon the party of record as follows:

Kristin M. Hurley, Esq.
Gordon Law Group, LLP
585 Boylston Street
Boston, MA 02116

Bronwyn L. Roberts

DM2\6560221.1