|  |  |
|---|---|
| STEVEN SERABIAN, | ) |
| Plaintiff, | ) |
| v. | ) Civil Action No. 16-cv-10501 |
| SAP AMERICA, INC., | ) |
| Defendant. | ) |

**MEMORANDUM AND ORDER**

CASPER, J.                                                    **February 23, 2018**

## I.     Introduction

Plaintiff Steven Serabian ("Serabian") has filed this lawsuit against Defendant SAP America, Inc., ("SAP") alleging failure to pay wages in violation of the Massachusetts Wage Act ("Wage Act"), Mass. Gen. L. c. 149, § 148 (Count I), breach of contract (Count II), breach of the implied covenant of good faith and fair dealing (Count III), retaliatory termination in violation of the Wage Act, Mass. Gen. L. c. 149, § 148A (Count IV), and unjust enrichment (Count V).[1] D. 1-2. Defendants have moved for partial summary judgment, seeking dismissal of Counts III and IV

---

[1] The complaint lists "Count IV" twice as "Count IV: Unjust Enrichment" and "Count IV: Retaliatory Termination in Violation of G.L. c. 149, § 148A." D. 1-2 at 16-17. SAP has moved for summary judgment on Count IV, specifying Serabian's retaliatory termination claim. D. 41. Serabian also referred to retaliatory termination as Count IV in his opposition. D. 46 at 1, 11. The Court thus accepts the parties' identification of the retaliatory termination claim as Count IV, and identifies the unjust enrichment claim as Count V.

in full and portions of Counts I and II. D. 41 at 1. For the reasons stated below, the Court DENIES IN PART and ALLOWS IN PART the motion for partial summary judgment.

## II. Standard of Review

The Court grants summary judgment where there is no genuine dispute as to any material fact and the undisputed facts demonstrate that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "A genuine issue is one that can 'be resolved in favor of either party' and a material fact is one which 'has the potential of affecting the outcome of the case.'" Gerald v. Univ. of P.R., 707 F.3d 7, 16 (1st Cir. 2013) (quoting Pérez-Cordero v. Wal-Mart P.R., Inc., 656 F.3d 19, 25 (1st Cir. 2011)). The movant bears the burden to demonstrate the absence of a genuine issue of material fact, Carmona v. Toledo, 215 F.3d 124, 132 (1st Cir. 2000), and they do so "by citing specifically to materials in the record or by 'showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.'" Colón-Fontánez v. Municipality of San Juan, 660 F.3d 17, 27 (1st Cir. 2011) (quoting Fed. R. Civ. P. 56(c)(1)). If the movant meets their burden, the non-moving party "must, with respect to each issue on which she would bear the burden of proof at trial, demonstrate that a trier of fact could reasonably resolve that issue in her favor." Borges ex rel. S.M.B.W. v. Serrano-Isern, 605 F.3d 1, 5 (1st Cir. 2010). "Neither party may rely on conclusory allegations or unsubstantiated denials, but must identify specific facts derived from the pleadings, depositions, answers to interrogatories, admissions and affidavits to demonstrate either the existence or absence of an issue of fact." Magee v. United States, 121 F.3d 1, 3 (1st Cir. 1997). The Court "view[s] the record in the light most favorable to the nonmovant, drawing reasonable inferences in his favor." Noonan v. Staples, Inc., 556 F.3d 20, 25 (1st Cir. 2009).

### III. Factual Background

The following facts are drawn from the parties' statements of material facts, D. 42; D. 47, and are undisputed unless otherwise noted.[2]

SAP is a corporation that sells "software and services to its customers for managing accounting, distribution, human resources and manufacturing functions," and "On Premise" and "Cloud" software are two major product categories of SAP's sales. D. 42 at 4; D. 47 at 20. Serabian was hired as an at-will employee on or about February 14, 2011 with the title Customer Relationship Management ("CRM") Sales Specialist, Line of Business Solutions. D. 42 at 4; D. 47 at 21. His compensation was set to include both a fixed salary and "variable compensation component" (i.e., commissions based on a percentage of his software sales). D. 42 at 4; D. 47 at 21.

#### A. Serabian's 2011 Compensation

Serabian's 2011 compensation was governed by a 2011 Compensation Package, which included the following provision: "[s]pecialist plan is subject to North America Operating Income Capped Funding." D. 42 at 5; D. 47 at 21. SAP states that this provision, known as the "Funding Factor," authorizes SAP to cap total commissions if they exceeded the amount SAP budgeted for a particular year and, therefore, adjust commissions for salespersons on a percentage basis. D. 42 at 5. Serabian disputes the details of the Funding Factor because SAP's production of the 2011 Compensation Package lacks the attachment regarding the "Capped Funding Methodology."

---

[2] SAP did not provide a separate "concise statement of the material facts of record as to which the moving party contends there is no genuine issue to be tried" as directed by the Local Rules. L.R. 56.1. Rather, SAP's "Statement of Facts" within its memorandum of law spans seven pages, lacks enumerated paragraphs, and does not assert that any facts therein are undisputed. D. 42 at 2-9. Serabian, however, has taken SAP's "Statement of Facts" as SAP's proposed undisputed facts, and responded line by line, highlighting whether facts are disputed. D. 47 at 20-30.

D. 42-6 at 10; D. 47 ¶¶ 1-2; D. 47 at 22. It is undisputed, however, that SAP applied the Funding Factor to 2011 commissions, resulting in a $93,512 adjustment for Serabian's 2011 commissions. D. 42 at 5; D. 47 at 22. Serabian disputes that this adjustment was appropriate under the Funding Factor plan. D. 47 at 22. Because SAP had already paid Serabian part of this amount as of the Funding Factor calculation date, SAP then informed him that they would subject $45,037 of his commissions to a "clawback" or "setoff from future commissions." D. 42 at 5; D. 47 at 22.

Serabian requested information from SAP regarding the payment of his 2011 compensation several times in 2012. D. 42 at 9-10; D. 47 at 29-30. He also requested information from SAP many times in 2012 and 2013 regarding those years' commissions. D. 42 at 10; D. 47 at 29-30.

## B.     The 2013 Special Performance Incentive ("SPIFF")

In March 2013, Serabian joined a new "indirect sales team" at SAP called the "SWAT" team. D. 42 at 5; D. 47 at 22. SAP created the SWAT team to "drive Cloud software sales following [SAP's] acquisition of a Cloud software company." Id. According to SAP, the SWAT team "was not directly responsible for closing deals, but was to monitor deals of a certain type and work with individual direct sales representatives to assist them in closing deals." D. 42 at 5. Serabian disputes this characterization. D. 47 at 23; D. 47 ¶ 21. SAP states that Serabian was given his compensation plan in writing in fall 2013. D. 42 at 6. Serabian disputes this point, stating that "[a] portion of Serabian's compensation was reduced to writing, and that is set forth in the 2013 plan." D. 47 at 23. Serabian contributed to a large transaction with Ernst & Young in or about September 2013 (the "Ernst & Young deal"). D. 42 at 6; D. 47 at 24.

SAP occasionally offers Special Performance Incentives, or "SPIFFs," as "additional variable compensation incentives outside of employee compensation plans." D. 42 at 6; D. 47 at 23. SAP states—and Serabian disputes—that SAP "requires that all SPIFFs be documented in writing," and that SPIFFs are "time-bound, product-specific, and typically apply to a subset of

SAP's sales team." Id. SAP relies upon an affidavit by Keith B. Hontz, who was Vice President and Manager of the SWAT team in 2013, in support of this point. D. 42 at 6; D. 42-1 ¶ 6. According to SAP, SAP offered a two percent SPIFF in 2013 to Direct Sales Team members for On-Premise software sales that "specifically provided" that the SPIFF applied only to direct sales team members, rendering SWAT team members ineligible for the SPIFF. D. 42 at 6. In support, SAP submits an October 30, 2013 email that contains an attachment announcing a Two Percent SPIFF that would apply to "[a]ll eligible quota carriers on the 2013 Cloud Bonus Plan able to sell solutions from the extended OnPremise and Cloud customer sales bag in 2013." D. 42-11 at 2, 7. The document states that it "applies ONLY to direct sales teams and [is] NOT intended for the indirect teams." D. 42-11 at 5.

Serabian disputes that the Two Percent SPIFF did not apply to him. D. 47 at 24. He states that "SAP announced the SPIFF for all 'CRM OnPremise' sales at a meeting in June/July 2013," pointing to his own deposition for support, in which he stated that "Joe Fuster, who ran CRM sales I believe either globally or for North America, told CRM sales force that they were offering a special incentive, a SPIFF of 2 percent for on-premise software deals that were sold." D. 42-3 at 20-21; D. 47 at 24; D. 47 ¶ 14. Serabian also presents a November 2013 email from Hontz providing his compensation for the third quarter of the fiscal year and stating that "[p]er Roger Martin, the 2% SPIFF for CRM OnPremise is being handled independently and he will follow up on those payments later." D. 47 ¶ 21; D. 48-12 at 4.

C.  **Fall 2014 and Serabian's Termination**

In September 2014, SAP decided to merge its CRM software sales team with its Hybris sales teams the following January. D. 42 at 6; D. 47 at 24. This transition would require merging certain CRM roles with Hybris roles. D. 42 at 7; D. 47 at 25. On September 17, 2014, Jeff Moses, a Senior Vice President of Sales at SAP, informed the Human Resources department that a

reduction-in-force in North America would be necessary by the end of 2014 to facilitate the merger. D. 42 at 7; D. 47 at 24-25. SAP needed to eliminate five CRM account executive positions and close three open positions, for a total of eight positions eliminated nationwide. D. 42 at 7; D. 47 at 25. SAP selected three divisions—the Northeast, Strategic Industries and West Coast—for position reduction "because they had the most sales representatives and would therefore still have coverage after the [reduction-in-force]." Id.

The parties dispute the process SAP undertook to determine which employees to terminate in the reduction-in-force. See D. 42 at 7-8; D. 47 at 27-28. SAP points to evidence that it considered only 2014 performance in this review and that Serabian was one of the lower performers-to-quota in the region. D. 42 at 7-8. Two other employees with low performance numbers were not selected because they were recently hired or added to the team and "had the skills and abilities that SAP wanted to retain." D. 42 at 8-9. Serabian, however, contends that the information regarding sales in the documents purportedly reviewed during this process was inaccurate, as the "Position Elimination Justification" document produced by SAP states Serabian's productivity was "$10k" for the 2014 year to date, D. 42-14 at 4, whereas a spreadsheet created by Roberto during this period and produced by SAP stated Serabian had a productivity of over $273,000 at that time, D. 42-13 at 18. D. 47 ¶¶ 28-29. Additionally, Serabian highlights that the "Position Elimination Document" contains a chart comparing the employees' prior years' performances, wherein Serabian alone held a prior performance rating of "Extraordinary." D. 42-14 at 5; D. 47 ¶¶ 28-30.

In September 2014, Serabian was a CRM account executive in the Northeast. D. 42 at 7; D. 47 at 25. Between February and October 2014, Serabian requested information from SAP over twenty times regarding commission payments owed. D. 42 at 11; D. 47 at 30. As of June 2014,

SAP had determined internally that it owed Serabian $928.082.29 on his 2013 deals.  D. 47 ¶ 11; D. 48-5 at 6.  Serabian repeatedly requested a detailed breakdown of commissions from the 2013 fiscal year beginning in February 2014, specifically focused on commissions from the E&Y Deal. D. 42-17 at 7-18.  On August 27, 2014, Ryan Toben, Vice President of Cloud Commercial Operations, told Serabian that "[t]he team looked into it and the initial answer raised more questions," noting that "[o]bviously this was both a large and unusual deal so I do not want to take incorrect actions."  D. 42-17 at 7.  On September 19, 2014, Hontz, then Global Vice President, Strategic Accounts, emailed Serabian, Toben and others, confirming that commissions would be paid according to his 2013 fiscal year payment plan.  D. 42-17 at 5.  For the Ernst & Young deal, this meant that in November 2014, Serabian was to receive "50% ACV payment" with the "remaining 50% ACV payment" set for November 2015.  Id.  Additionally, he provided a payment structure on which the group had agreed by phone that included the requirement that certain commissions be provided that day and certain others be determined and paid by the following week.  Id.  Serabian followed up to determine payment amounts and dates for the E&Y commission, and on October 7, 2014, he was informed that $57,684.30 had been "entered into the next payroll."  D. 42-17 at 3.  Throughout October, Serabian continued to inquire about "outstanding FY13 commissions" that he had not received.  D. 42-17 at 2.

Based on data provided by Cindy Roberto, Vice President of Sales, Northeast, the human resources department obtained approval to notify Serabian and one other employee of their termination.  D. 42 at 10; D. 47 at 29.  SAP informed Serabian of his termination on or about October 22, 2014 and the termination became effective November 21, 2014.  Id.  According to Serabian, upon his termination, SAP paid Serabian one-half of the $235,638 owed in commission for the E&Y deal.  D. 47 ¶ 12 n.1.

**IV. Procedural History**

Serabian instituted this action on or about January 26, 2016 in Middlesex Superior Court, and on March 10, 2016, SAP removed the case to this Court. D. 1. SAP has now moved for summary judgment. SAP subsequently moved to strike certain exhibits attached to Serabian's opposition papers and the portions of his opposition that relies upon those contested exhibits. D. 51.[3] The Court heard the parties on the pending motions and took these matters under advisement. D. 54.

**V. Discussion**

SAP urges the Court to grant summary judgment on Counts III and IV, as well as the portions of Counts I and II that "relate to 2011 incentive compensation and a 2013 special incentive." Id.

**A.      Count III – Breach of the Implied Covenant of Good Faith and Fair Dealing**

Although Massachusetts generally recognizes that at-will employment can be terminated by either party without reason, the "covenant of good faith and fair dealing is 'implicit in all Massachusetts contracts, including contracts for employment at will.'" Artuso v. Vertex Pharms., Inc., 637 F.3d 1, 8 (1st Cir. 2011) (quoting Harrison v. NetCentric Corp., 433 Mass. 465, 473 (2001)). The plaintiff has the burden of proving lack of good faith, which may be inferred from the totality of the circumstances. T.W. Nickerson, Inc. v. Fleet Nat'l Bank, 456 Mass. 562, 570 (2010). Massachusetts law recognizes a breach of the implied covenant of good faith and fair

---

[3] In resolving SAP's summary judgment motion, D. 41, the Court has not relied upon any of the documents identified in SAP's motion to strike, D. 51, the contents of which are largely replicated in documents not in dispute, see D. 42-17. The Court thus DENIES SAP's motion to strike as moot.

dealing in two limited circumstances involving termination of at-will employees: "(1) when an employer terminates an employee to avoid payment of future expected compensation for past services or expected benefits (the financial benefit prong) or (2) when employment was terminated contrary to a clearly established public policy." Wong v. Resolve Tech., No. 10-11642-DJC, 2011 U.S. Dist. LEXIS 80733, at *20 (D. Mass. July 25, 2011); see Shen v. Biogen Idec Inc., 523 F. Supp. 2d 48, 54 (D. Mass. 2007). To prove a violation of the implied covenant based on the financial benefit prong, the employee must show that the employer deprived him of money he "had fairly earned and legitimately expected." Maddaloni v. W. Mass. Bus Lines, Inc., 386 Mass. 877, 884 (1982).

Serabian's theory falls within the financial benefit prong, as he argues that SAP terminated him to avoid paying his commissions. D. 1-2 ¶ 49; D. 46 at 11-12. Serabian sought "over $900,000 in SPIFFs and commissions" in his email correspondence with SAP executives prior to his termination.[4] D. 46 at 12. Serabian argues that SAP has a history of depriving him of earned commissions, as SAP admitted it owed Serabian around $93,000 in commissions from 2011, but then clawed back that commission in 2012. D. 46 at 11. Serabian has also produced a June 2014 email stating that he earned $928,082.29 in commissions in 2013, $74,338.59 of which was outstanding at the time. D. 48 ¶ 6; D. 48-5 at 10. SAP's own submissions include an email exchange documenting Serabian's pursuit of unpaid commissions, in which—after months of persistence on Serabian's part—Hontz confirmed on September 19, 2014 that Serabian was owed

---

[4] Serabian also states in a footnote in his statement of facts that he was entitled to $235,738 in commissions from the Ernst & Young deal at the time of his departure, and was only paid half that amount. D. 47 ¶ 12 n.1; see D. 1-2 at 3. Serabian has not provided factual support to show that he was entitled to this money at the time of his departure, but SAP has also failed to provide evidence to show Serabian was paid the commissions to which he was entitled upon his termination.

substantial commission payments.  See D. 42-17 at 5-18.  Hontz also established "[p]ayment [a]ctions [m]oving [f]orward" directing others to provide commission information and payment to Serabian by specific dates, and it does not appear that those individuals followed that directive, as Serabian continued to pursue those items in the following weeks.  D. 42-17 at 2-6.  Notably, the "position elimination justification" document was created only five days after Hontz's email.  D. 46 at 7.  At the motion hearing, Serabian argued that the temporal proximity between Serabian's complaints about unpaid commissions and his termination supports his theory that he was terminated to avoid payment of commissions he was owed.  See Shen, 523 F. Supp. 2d at 54 (explaining that "[i]n the typical case, the plaintiff is discharged on the eve of receiving a large bonus or commission for services rendered"); Fortune v. Nat'l Cash Register Co., 373 Mass. 96, 104-05 (1977) (explaining that the evidence that the plaintiff's termination the day after the employer obtained a large order could reasonably support a jury verdict that his termination "was motivated by a desire to pay [the plaintiff] as little of the bonus credit as it could").

SAP has not produced a record upon which the Court may allow summary judgment in its favor.  SAP relies exclusively on its "Position Elimination Justification" document to argue that Serabian's termination was related to SAP's business needs and that Serabian cannot provide "evidence that anyone at SAP considered commissions when deciding" to terminate him.  D. 42 at 12-14.  In making this argument, however, SAP ignores that lack of good faith may be inferred from the totality of the circumstances.  See T.W. Nickerson, 456 Mass. at 570; Gram v. Liberty Mut. Ins. Co., 384 Mass. 659, 672 (1981) (explaining that the "absence of good faith need not be proved to the extent that there must be a showing of improper motive for the discharge").  SAP has not demonstrated as a matter of undisputed fact that it paid Serabian all of the commissions he was owed at the time of his termination.  See D. 42 at 4-11.  That is, viewing the record in the light

most favorable to Serabian as the nonmovant, see Noonan, 556 F.3d at 25, a factfinder could reasonably infer based on the totality of the circumstances that SAP owed Serabian commissions in fall 2014 and terminated him to avoid paying those commissions. SAP has not carried its burden to show it is entitled to judgment as a matter of law on this claim on the present record. See Carmona, 215 F.3d at 132; Fed. R. Civ. P. 56(a). The Court thus DENIES SAP's motion for summary judgment as to this claim.

**B.      Count IV – Retaliatory Termination in Violation of the Wage Act**

Serabian has alleged that he was terminated in violation of the Wage Act for complaining about, and pursuing earned and unpaid commissions. D. 1-2 ¶¶ 53-54. The Wage Act provides that "[n]o employee shall be penalized by an employer in any way as a result of any action on the part of an employee to seek his or her rights under the wages and hours provisions of this chapter." Mass. Gen. L. c. 149, § 148A. In other words, Section 148A "prohibit[s] employers from retaliating against employees for making internal allegations of wage violations." Smith v. Winter Place LLC, 447 Mass. 363, 365 (2006). The plaintiff bears the burden of showing that the employer's justification for the adverse action is pretextual and that there is a "causal connection" between the employee's action and the employer's adverse action. See, e.g., Joyce v. The Upper Crust, LLC, No. 10-12204-DJC, 2015 U.S. Dist. LEXIS 95542, at *18 (D. Mass. July 21, 2015); Belghiti v. Select Rests., Inc., No. 10-12049-GAO, 2014 U.S. Dist. LEXIS 42917, at *12 (D. Mass. Mar. 31, 2014). Courts are "especially cautious before granting summary judgment when pretext and retaliatory animus are at issue." Harrington v. Aggregate Indus. Ne. Region, Inc., 668 F.3d 25, 33 (1st Cir. 2012). A plaintiff may show pretext and causation by providing "circumstantial evidence based on the temporal proximity between a plaintiff's action and a defendant's adverse

action." Belghiti, 2014 U.S. Dist. LEXIS 42917, at *12; see Sánchez-Rodríguez v. AT&T Mobility P.R., Inc., 673 F.3d 1, 15 (1st Cir. 2012).

SAP argues that Serabian has failed to prove causation and pretext as required for this claim. D. 42 at 15-19. SAP asserts that, as with Count III, SAP has produced undisputed evidence suggesting Serabian was terminated for legitimate business reasons: they "compare[d] all account executives on the same basis – their performance in the CRM role under Roberto – rather than their prior performance in various roles at SAP," and exercised their business judgment accordingly. D. 42 at 16.

Serabian, however, argues he has proven causation and pretext through both temporal proximity and other circumstantial evidence. D. 46 at 7-9. Regarding temporal proximity, Serabian points to evidence that the "position elimination justification" documentation SAP used to support its reduction in force was created on September 24, 2017, only five days after Hontz confirmed that SAP owed substantial commissions to Serabian and established their time of payment, and amid Serabian's ongoing pursuit of his commissions. D. 42-17 at 4; D. 46 at 7. SAP counters that Serabian pursued unpaid commissions numerous times throughout his tenure and SAP was aware of such inquiries as early as spring of 2012, more than two years before Plaintiff's employment ended. D. 42 at 18. This may be true, but Serabian's 2014 commission inquiries focused upon his 2013 commissions, and it was only after numerous emails from him that SAP executives—namely, Hontz—confirmed the commissions owed to him. D. 42-17 at 4. Furthermore, Serabian also highlights evidence casting doubt on SAP's purported processes undertaken to determine which CRM sales employees to terminate within the 2014 reduction-in-force. D. 46 at 8-9. For example, the SAP position elimination document contains a table displaying the 2013 performance ratings of the relevant employees. D. 42-14 at 5. Serabian also

points out the contrast between the sales numbers in the position elimination document—around $10,000—and the 2014 sales spreadsheet—around $273,000—as evidence of pretext. D. 46 at 8-9; D. 47 ¶ 29 (citing D. 42-13 at 18).

Additionally, although SAP did not dispute that Serabian's compensation inquiries constituted protected activity under the Wage Act in its summary judgment motion, D. 42 at 15, SAP subsequently sought leave to file a bench memorandum (D. 53, which this Court has allowed), arguing that Tam v. Fed. Mgmt. Co. "provides new, relevant guidance concerning what constitutes protected activity under the Massachusetts Wage Act" such that Serabian's inquiries into his commissions would not qualify. D. 53 at 1; see Tam, No. 137679, 2017 Mass. Super. LEXIS 127, at *9 (July 21, 2017) (relying upon FLSA jurisprudence to explain that "'abstract grumblings' about pay are insufficient" to constitute protected activity under the Wage Act).

The Court declines to allow summary judgment on Count IV on the basis of Tam, however, for two reasons. First, the Court does not equate the Wage Act's retaliation provision with the FLSA retaliation provision. Compare Smith, 447 Mass. at 367 (explaining that "[t]he plain language of the first paragraph of § 148A extends the protection of the statute to employees who are penalized for taking 'any action' to seek their rights under the laws governing wages and hours"), with 29 U.S.C. § 215(a)(3) (protecting from retaliation an employee who has "filed a complaint" or otherwise instituted any proceeding or testified regarding same). Second, even under FLSA jurisprudence, Serabian's pay complaints would qualify as protected activity. Under the FLSA, "a complaint is filed when a reasonable, objective person would have understood the employee to have put the employer on notice that the employee is asserting statutory rights under the Act." Kasten v. Saint-Gobain Performance Plastics Corp., 563 U.S. 1, 14 (2011) (internal quotation marks and alterations omitted). In Tam, the plaintiff's complaints about long hours and

pursuit of a pay raise or assistance were not "sufficiently clear and detailed for a reasonable employer to understand it . . . as an assertion of rights protected by the statute, and a call for their protection." Tam, 2017 Mass. Super. LEXIS 127, at *8 (quoting Kasten, 563 U.S. at 14). Serabian's conduct, by contrast, consisted of numerous emails in 2014 to SAP executives and human resources employees detailing commissions he believed he was owed and entitled to from 2013. See D. 42-17. Such activity can hardly be considered "abstract grumblings," cf. Tam, 2017 Mass. Super. LEXIS 127, at *9, and the Court reasonably infers that SAP was on notice of Serabian's Wage Act claim at that time.

The Court thus DENIES SAP's motion as to Count IV.

**C.** **Counts I and II**

Serabian has alleged Wage Act violations and breach of contract in Counts I and II, respectively, for unpaid commissions that he was owed. D. 1-2 ¶¶ 44, 47. The complaint frames these allegations broadly, without specifying which contract or contracts were allegedly breached and which allegedly unpaid commissions fall within the counts. See id. SAP has moved for summary judgment on these counts to the extent they are based upon SAP's Serabian's 2011 commissions and his pursuit of a two percent SPIFF for the Ernst & Young deal. D. 42 at 19-22.

*1. The 2011 Commissions*

SAP has moved for summary judgment on Counts I and II to the extent Serabian is basing these claims on his 2011 commissions. D. 42 at 19-20. First, SAP argues that these claims are time-barred for Count I by the Wage Act's three-year statute of limitations. D. 42 at 20; see Mass. Gen. L. c. 149, § 150. Serabian does not dispute this, and accepts that his 2011 commission claims "do not fall under Count I." D. 46 at 4. The Court thus ALLOWS SAP's motion on Count I to the extent it relies on 2011 commissions.

Second, SAP argues that the Court should grant summary judgment in its favor on Count II—breach of contract—regarding Serabian's 2011 commissions because SAP was acting within its contract by applying the Funding Factor on Serabian's 2011 commissions. D. 42 at 19. SAP notes that the undisputed 2011 Compensation Plan contains a capped funding provision, which Serabian acknowledges resulted in the $93,000 clawback in some way. Id. Serabian disputes that this Funding Factor was applied appropriately, D. 47 at 22, but primarily seeks to rebut SAP's motion in this regard by contending that SAP "does not contest [the 2011 compensation] claims under the breach of contract count," and thus "does not address the applicability of" Count II "to the 2011 commission claims." D. 46 at 4. SAP, however, has plainly contested those claims under Count II, D. 42 at 19, and Serabian has failed to show a genuine issue of material fact as to this this claim as it pertains to the 2011 commissions. "A party who aspires to oppose a summary judgment motion must spell out his arguments squarely and distinctly. . . . [and t]he district court is free to disregard arguments that are not adequately developed . . . ." Higgins v. New Balance Athletic Shoe, Inc., 194 F.3d 252, 260 (1st Cir. 1999). The Court thus grants SAP's motion for summary judgment on Count II regarding Serabian's 2011 commissions.

### 2. The SPIFF Claims

SAP also argues that Counts I and II fail as to Serabian's pursuit of a two percent SPIFF because those funds were never "promised or due and payable to him" by SAP. D. 42 at 20. SAP argues that there was no enforceable contract between SAP and Serabian such that SAP could be liable for breach or violation of the Wage Act. D. 42 at 20-22. SAP explains that the SPIFF documentation provided to sales employees was too vague and ambiguous to be a binding contract, and, by its very terms, the SPIFF did not apply to Serabian. Id. Because no contract was formed, the argument goes, SAP had no obligation to pay Serabian these commissions under the Wage Act. Id. The Court addresses each Count in turn.

a)      Count II – Breach of Contract

To prevail on a breach of contract claim under Massachusetts law, "a plaintiff must show: 1) the existence of a valid and binding contract, 2) that the defendant breached the terms of the contract, and 3) that the plaintiff has suffered damages from the breach." Pizzeria Uno Corp. v. Pizza by Pubs, Inc., No. 09-12015-DJC, 2011 U.S. Dist. LEXIS 101648, at *3 (D. Mass. Sept. 9, 2011) (citing Coll v. PB Diagnostic Sys., Inc., 50 F.3d 1115, 1122 (1st Cir. 1995)).  To prove the existence of a contract, "[a]ll the essential terms of a contract must be definite and certain so that the intention of the parties may be discovered, the nature and extent of their obligations ascertained, and their rights determined." PSMG Int'l, Inc. v. Nodine's Smokehouse, Inc., No. 08-cv-10269-RGS, 2009 U.S. Dist. LEXIS 102296, at *7-8 (D. Mass. Nov. 3, 2009); see Situation Mgmt. Sys., Inc. v. Malouf, Inc., 430 Mass. 875, 878 (2000).  "Whether an alleged contract is legally enforceable in light of indefinite terms is a question of law for the court." Armstrong v. Rohm & Haas Co., 349 F. Supp. 2d 71, 78 (D. Mass. 2004).

Serabian's allegation of an oral promise of a SPIFF is too indefinite to give rise to a legally enforceable contract.  SAP argues that Serabian's contract claim relies exclusively upon the alleged announcement made in summer 2013, described by Serabian in his deposition:  "Joe Fuster, who ran CRM sales I believe either globally or for North America, told CRM sales force that they were offering a special incentive, a SPIFF of 2 percent for on-premise software deals that were sold." D. 42 at 21; D. 42-3 at 20-21.  This alleged announcement, SAP explains, "did not contain any specific sales teams to whom SPIFF applied, for what duration, or the specific deals or products to which it applied." D. 42 at 22.  SAP is correct.  The statement fails to identify the duration of the incentive plan, the scope of the plan, the type of work to which it would apply and the positions covered by the SPIFF.  See Cooper v. Kenexa Tech., Inc., No. 10-12189-DJC, 2012 U.S. Dist. LEXIS 99901, at *16 (D. Mass. July 19, 2012) (holding an alleged contract was

unenforceable because the oral promise of a bonus was "too vague, particularly in absence of agreement on material terms"); Conway v. Licata, 104 F. Supp. 3d 104, 114 (D. Mass. 2015) (holding a purported contract unenforceable for lacking material terms such as rate or procedure for determining compensation, type of work required and duration of the agreement); Armstrong, 349 F. Supp. 2d at 80-81 (explaining that "the law will refuse to enforce a simple and direct promise if it is unduly vague"). Serabian does not dispute SAP's characterization of the specificity of Fuster's alleged promise. D. 47 ¶¶ 13-14.

Moreover, the terms of the written SPIFF document are not ambiguous as to whom they apply. A contract term is ambiguous if it is "susceptible of more than one meaning." Prozinski v. Northeast Real Estate Servs., LLC, 59 Mass. App. Ct. 599, 605 (2003) (quoting Citation Ins. Co. v. Gomez, 426 Mass. 379, 381 (1998)) (internal quotation marks omitted). The written documentation for the two percent SPIFF plainly states that it "applies ONLY to direct sales teams and [is] NOT intended for the indirect sales teams." D. 42-11 at 5 (emphasis in original); D. 42 at 22. SAP also provides an affidavit by Hontz, who was the Vice President and manager of the SWAT team in 2013, who states that the "SWAT Team was an indirect sales team." D. 42-1 ¶ 6. Serabian does not dispute that the SWAT team was an indirect sales team. D. 42 at 5; D. 47 at 22. Serabian argues instead that his role in the Ernst & Young deal was not indirect, and, therefore, the document applies to him. But that is not the criteria in the express language of the contract itself. The 2013 SPIFF document applies only to "direct sales teams," not employees who perform direct sales work. Serabian was not a member of a direct sales team. The terms of the 2013 SPIFF document do not apply to him as a matter of law.

To the extent Serabian believes a contract arose between the parties otherwise—through words or course of conduct—he has failed to identify any such enforceable contract. "The Court

is not obligated to ferret through the record for evidence of a viable theory of recovery." <u>Conway</u>, 104 F. Supp. 3d at 116 (citing Fed. R. Civ. P. 56(c)(3)). By contrast, as discussed above, SAP has demonstrated as a matter of undisputed fact that there was no enforceable contract formed with Serabian regarding the 2013 SPIFF. Accordingly, the Court ALLOWS SAP's summary judgment motion as it pertains to the 2013 SPIFF claim asserted as part of Count II.

b)  <u>Count I – Wage Act Violations</u>

The Wage Act applies to commissions "when the amount of such commissions, less allowable or authorized deductions, has been definitely determined and has become due and payable to such employee." Mass. Gen. L. c. 149, § 148. The Supreme Judicial Court has consistently interpreted the Wage Act's purpose as "provid[ing] strong statutory protection for employees and their right to wages." <u>Crocker v. Townsend Oil Co.</u>, 464 Mass. 1, 13 (2012). Nevertheless, "[w]hen a compensation plan specifically sets out the contingencies an employee must meet to earn a commission, courts apply the terms of the plan." <u>McAleer v. Prudential Ins. Co.</u>, 928 F. Supp. 2d 280, 289 (D. Mass. 2013).

SAP does not dispute that PIFF payments qualify as commissions, but rather argues that they are not liable for these payments under the Wage Act because such payments were not "due and payable" to Serabian. D. 42 at 20-22. Serabian provides no other bases for these payments' status as "due and payable" under Count I beyond those he presented in support of his contentions regarding Count II, the breach of contract claim. D. 46 at 11-14. Considering the terms of the 2013 SPIFF plan, and seeing no other enforceable compensation plan, Serabian has not shown a genuine issue of fact as to whether the two percent SPIFF payments were due and payable for the E&Y deal under the Wage Act and SAP is entitled to summary judgment as to this claim as a

matter of law.  Accordingly, the Court ALLOWS SAP's motion for summary judgment as to the two percent SPIFF claim asserted in Count I.

## VI.     Conclusion

For the foregoing reasons, the Court ALLOWS Defendants' motion for summary judgment, D. 41, as to Counts I and II with respect to the 2011 commission payments and 2013 SPIFF payments.  The Court DENIES Defendants' motion for summary judgment as it pertains to Counts III and IV.  Accordingly, the remainder of Counts I and II, along with the entirety of Counts III, IV and V shall proceed to trial.

**So Ordered.**

/s/ Denise J. Casper
United States District Judge